**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAUN ROBERTS and KEN SHEPPARD, Individually and on Behalf of All Others Similarly Situated, <br><br>                   Plaintiffs, <br><br>       v. <br><br> STEPHEN EHRLICH, GERARD HANSHE, DAVID BROSGOL, JANICE BARRILLEAUX, PHILIP EYTAN, JARRETT LILIEN, and BRIAN BROOKS, <br><br>                   Defendants. | Case No. 22-cv-9590 <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs Shaun Roberts and Ken Sheppard ("Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege the following against Defendants Stephen Ehrlich, Gerard Hanshe, David Brosgol, and Janice Barrilleaux (the "Executive Defendants") and Philip Eytan, Jarrett Lilien, and Brian Brooks (the "Director Defendants"). The Executive Defendants and the Director Defendants are referred to collectively as "Defendants." Defendants are the officers, directors, or otherwise controlled Voyager Digital Holdings Inc. and its affiliates Voyager Digital Ltd. and Voyager Digital, LLC (collectively, "Voyager"). Plaintiffs' allegations herein are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after additional opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action on behalf of all investors who purchased unregistered securities in the form of: (1) cryptocurrency interest-earning accounts referred to as Voyager's "Earn Program" ("Earn Accounts")[1]; and (2) Voyager Tokens ("VGX" or "VGX Token") issued and sold by Defendants and Voyager (collectively, the "Voyager Financial Products").

2.      Voyager is a financial services company that generates revenue through cryptocurrency trading, lending, borrowing, and the sale of its unregistered Earn Program and VGX securities.  Voyager raised billions of dollars through the sale of these unregistered securities in violation of the registration provisions of the federal securities laws, thereby funding Voyager's operation and enriching Defendants.

3.      Voyager has offered and sold Voyager Earn Accounts to retail investors, through which those investors lent crypto assets to Voyager in exchange for Voyager's promise to provide a variable monthly interest payment.  Voyager generated the interest paid out to Earn Account investors by deploying their and its assets in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars and stablecoins to retail investors, and by investing in other highly speculative cryptocurrency ventures.  Voyager also pooled these cryptocurrencies together to fund its lending operations and proprietary trading.

4.      In exchange for their investments in the Voyager Earn Accounts, investors were promised above-market interest rates that were paid monthly in cryptocurrency.  The Earn Accounts are not registered with the U.S. Securities & Exchange Commission ("SEC") or any other securities regulatory authority.  Nor are they protected by the Securities Investor Protection Corporation ("SIPC") or insured by the Federal Deposit Insurance Corporation ("FDIC").

---

[1]      Voyager has previously referred to these cryptocurrency interest account products as the Voyager Interest Program and Voyager Rewards.

5.      This lack of a protective scheme or regulatory oversight subjected Voyager Earn Account investors to significant additional risks not borne by investors who maintain assets with most SIPC-member broker-dealers, or with banks, savings associations, or credit unions.

6.      Nevertheless, as of March 1, 2022, Voyager had approximately 1,530,000 Voyager Earn Accounts, holding approximately $5 billion in investor assets.

7.      In order to drive demand for Voyager Earn Accounts, Defendants aggressively marketed those investments as a low risk way to "grow your crypto portfolio."

8.      Since mid-2021, Voyager has also been funding its operations through the sale of unregistered securities in the form of VGX Tokens.

9.      Federal securities laws require any security that is offered or sold to be registered with the SEC.  Similarly, both the New Jersey Uniform Securities Law and the California Corporate Securities Law of 1968 require that securities offered or sold be either qualified with the Commissioner of Corporations or exempted from registration by a specific Rule of the Commissioner or law.  These securities laws are designed to protect the public by requiring various disclosures so that investors can better understand the security that is being offered or sold, as well as risks associated with investment in that security.  Absent the disclosures required by law about those efforts and the progress and prospects of the enterprise, significant informational asymmetries may exist between the management and promoters of the enterprise on the one hand, and investors and prospective investors on the other hand.  The reduction of these information asymmetries through required disclosures protects investors and is one of the primary purposes of the securities laws.

10.      Under Section 2(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77b(a)(1), a "security" is defined to include any "note," "bond," or "investment contract."

Similarly, both the New Jersey Uniform Securities Law and California Corporations Code define a "security" to include any "note," "bond," or "investment contract."

11.     The Earn Accounts were securities under the test set forth in *Reves v. Ernst & Young*, 494 U.S. 56, 64-66 (1990) ("*Reves*"), and its progeny.   Additionally, both the Earn Accounts and VGX Tokens are investment contracts.

12.     The SEC has made it clear that digital tokens, such as VGX, often constitute "securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration."[2]

13.     The SEC's Strategic Hub for Innovation and Financial Technology ("FinHub") has also published the Framework for 'Investment Contract' Analysis of Digital Assets ("SEC Framework"), providing guidance for assessing whether a crypto-token offering is a security under federal law.[3]   As explained in more detail below, applying the analysis in the SEC Framework and applicable precedent, the VGX Tokens offered and sold by Defendants have all the traditional hallmarks of a security, as reflected in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"), and subsequent case law.

14.     VGX purchasers, including Plaintiffs, provided money consideration (in the form of fiat, including U.S. dollars, or other cryptocurrencies) in exchange for VGX.   VGX purchasers reasonably expected to derive profits from their ownership of VGX, and Defendants themselves have frequently highlighted this profit motive and have taken steps to accomplish it, including by

---

[2]     *See Investor Bulletin: Initial Coin Offerings*, U.S. SEC (July 25, 2017), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings; *see also In re Matter of Munchee Inc.*, SEC Release No. 10445, 2017 WL 10605969, at *7 (Dec. 11, 2017) ("[T]okens, coins or other digital assets issued on a blockchain may be securities under the federal securities laws, and, if they are securities, issuers and others who offer or sell them in the United States must register the offering and sale with the Commission or qualify for an exemption from registration.").

[3]     Bill Hinman & Valerie Szczepanik, *Statement on "'Framework for Investment Contract' Analysis of Digital Assets"*, U.S. SEC (Apr. 3, 2019), https://www.sec.gov/news/public-statement/statement-framework-investment-contract-analysis-digital-assets.

promoting VGX. Additionally, the development of the Voyager platform, and the profits that investors expected to derive therefrom, were, and are, based on the technical, managerial, and entrepreneurial efforts of Defendants and other third parties employed by Defendants.

15.     However, Defendants did not register their Earn Accounts or VGX with the SEC or any state securities regulators, and many of the representations Defendants made regarding these investment products were designed to drive demand from, allowing Defendants to obtain greater returns. It is situations exactly like this that federal and state securities laws were enacted to prevent.

16.     On March 29, 2022, the New Jersey Bureau of Securities issued a cease-and-desist order, finding that the Voyager Earn Accounts were securities and that Voyager offered and sold these unregistered securities in violation of New Jersey law. Despite being on clear notice that their Voyager Earn Accounts constituted unregistered securities, Voyager and Defendants continued to offer these unregistered securities to retail investors across the United States.

17.     In mid-2022, the price of cryptocurrency assets declined across the board as did demand for new cryptocurrency investments. This broader market downturn exposed the fragility of Voyager's investment products and revealed that Voyager did not have enough assets on hand to meet its withdrawal obligations.

18.     On July 1, 2022, Voyager suspended withdrawals from its platform and on July 6, 2022, Voyager filed for Chapter 11 bankruptcy. Voyager's inability to honor investor withdrawals and its subsequent bankruptcy filing underscores investors' reliance on the efforts of Voyager and Defendants to provide the expected profits. Ultimately, Voyager and Defendants' efforts fell short, and it is Plaintiffs and the Class that bore the cost of that failure.

## THE PARTIES

### *Plaintiffs*

19.     Plaintiff Shaun Roberts is a citizen of the State of California and resides in San Diego, California.  Plaintiff Roberts invested in both the Voyager Earn Account and VGX Token during the Class Period and suffered investment losses as a result of Defendants' conduct.

20.     Plaintiff Ken Sheppard is a citizen of the State of New Jersey and resides in Clifton, New Jersey.  Plaintiff Sheppard invested in both the Voyager Earn Account and VGX Token during the Class Period and suffered investment losses as a result of Defendants' conduct.

### *Defendants*

21.     Defendant Stephen Ehrlich ("Ehrlich") is the Chief Executive Officer ("CEO") of Voyager, a position he has held since 2018.  Ehrlich is a resident of Connecticut.  Ehrlich also sits on Voyager's Board of Directors (the "Board").  Ehrlich exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

22.     Defendant Gerard Hanshe ("Hanshe") is the Chief Operating Officer ("COO") of Voyager, a position he has held since October 2019.  Hanshe is a resident of Levittown, New York. Hanshe exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

23.     Defendant David Brosgol ("Brosgol") is the General Counsel of Voyager, a position he has held since February 2021.  Brosgol is a resident of New York.  Brosgol exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

24.     Defendant Janice Barrilleaux ("Barrilleaux") is the Chief Administrative Officer of Voyager, a position she has held since May 2018.  Barrilleaux is a resident of Sacramento, California.  Barrilleaux exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

25.     Philip Eytan ("Eytan") is the Co-Founder of Voyager and the Chairman of Voyager's Board of Directors, a position he has held since on or about February 2018.  Eytan exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

26.     Defendant Jarrett Lilien ("Lilien") joined Voyager's Board of Directors on or about April 16, 2019 and continued in that role until on or about May 20, 2021.  Lilien exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

27.     Defendant Brian Brooks ("Brooks") joined Voyager's Board of Directors on or about December 20, 2021.  When Brooks joined Voyager's Board, the Chairman commented that his "extensive background as an executive at major crypto companies and as the leader of important government regulatory initiatives in the crypto space will help propel the growth of digital assets and Voyager's business."  Brooks exercised control over Voyager and directed and/or authorized, directly or indirectly, the sale and solicitation of Voyager Earn Accounts and VGX Tokens to the public.

## JURISDICTION AND VENUE

28.     This Complaint is filed, and these proceedings are instituted, to recover damages and to obtain other relief that Plaintiffs have sustained due to Defendants' unregistered and unqualified offers and sales of securities in violation of Sections 5, 12(a)(1), and 15 of the

Securities Act, 15 U.S.C. §§77e, 77l, and 77o, Sections 13 and 24 of the New Jersey Uniform Securities Law, N.J.S.A. §§49:3-60, 49:3-71 and Sections 25110, 25503, 25504, and 25504.1 of the California Corporations Code.

29.     This Court has subject-matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. §1367.

30.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' unregistered offers and sales of securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§77e, 77l, and 77o, Sections 13 and 24 of the New Jersey Uniform Securities Law, N.J.S.A. §§49:3-60 49:3-71 and Sections 25110, 25503, 25504, and 25504.1 of the California Corporations Code.

31.     This Court also has personal jurisdiction over Defendants because they reside or have their principal places of business in New York.

32.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1391(b) and (c).

## SUBSTANTIVE ALLEGATIONS

### A.     Voyager's Earn Accounts

33.     In or about late 2019, Voyager began offering Earn Account investments to retail investors throughout the United States through a website accessible to the general public at https://www.investvoyager.com/ (the "Voyager Website"), which was also accessible through Voyager's own smartphone application.

8

34.     Voyager offered and sold its Earn Account unregistered securities in the form of individual and corporate accounts.  Investors in these accounts ("Earn Program Investors") deposited certain cryptocurrencies with Voyager to earn "up to 12% Rewards."  These rates advertised by Voyager were well in excess of the rates concurrently offered on short-term investment-grade fixed income securities or in bank savings accounts.

35.     After obtaining transfers of cryptocurrencies from retail investors, Voyager then pooled these cryptocurrencies together to fund its various income generating activities, including its lending operation, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency platforms, such as the also bankrupt Celsius Network.  In exchange for investing in the Earn Accounts, investors were promised an attractive interest rate that is paid monthly in the same type of cryptocurrency as originally invested.

36.     The Voyager Website required Earn Program Investors to maintain a specified minimum average monthly balance for an investor to earn interest on their Earn Account balances. Specific minimum balances for particular coins are listed on the Voyager app information page for that coin.

37.     Voyager advertised that Earn Program Investors would earn a variable interest rate on their investment and could withdraw their digital assets at any time.  However, on July 1, 2022, Voyager suspended withdrawals from its platform.  Plaintiffs and other Earn Program Investors have been unable to access their investments since that time.

38.     As of March 2022, interest rates for Earn Program Investors' deposits ranged from 0.5% for the "OMG" cryptocoin to 12% for "Polkadot," another coin.  Voyager advertised a 4.25% interest rate on Ethereum deposits and 4.05% interest rate on Bitcoin deposits.  Perhaps most

significantly, Voyager advertised a 9% interest rate for USDC stablecoin deposits — a rate orders of magnitude higher than that available at the time for U.S. dollar deposits at banks.

**B.    Voyager and Defendants Promoted Earn Accounts as Investment Products**

39.    Voyager encouraged its Earn Program Investors to think of their Earn Accounts as investments on its aptly named www.investvoyager.com website, which invited investors to "Grow your crypto portfolio" and "journey to the new frontier of investing."

With advanced market data, interactive charts, news, and professional research, Voyager gives you the powerful tools you need to gain a competitive edge in the crypto market. Let Voyager be your guide towards the future of investing.

**Grow your crypto portfolio**

40.    Voyager also encouraged Earn Program Investors to "Earn rewards and beat your bank."



10

41.     Defendants also encouraged retail investors to invest in Voyager's Earn Accounts through both legacy media appearances and social media posts.

42.     On May 3, 2021, Defendant Ehrlich made a number of dubious representations to induce people to invest in Voyager, including that he and Voyager are "**really trying to create wealth for retail consumers**," and, citing his 25 years of experience in finance, as evidence that he is "**looking out for the best interests of consumers**."[4]

43.     On October 13, 2021, Ehrlich was asked in an interview, "is it true that customers own the crypto, specifically Bitcoin and Ethereum, on your platform, where that's not necessarily the case on other platforms?"   Ehrlich responded that customers "absolutely own" the cryptocurrency held on Voyager's platform and can withdraw it at any time.[5]

> Yeah, **they absolutely own it**. **They can take it off the platform any time they want** and bring it into their own personal wallets.  You know, a lot of customers want us to hold it for them and everybody who brings crypto into us has a specified wallet address for them.  But if you want to take it out to your own personal wallet, say you have a Trezor or a Ledger or you were using some other wallet app – **yeah, you can take it any time you want**.  Now we have limits on withdrawals and that's for customer safety and protection but, **you can take anything off whenever you want, you know, no questions asked.**

44.     Ehrlich emphasized that this ownership of the cryptocurrency assets is "a differentiator" from other cryptocurrency applications.

45.     On March 11, 2022, Ehrlich took to Reddit to host an Ask Me Anything ("AMA") session on the r/Invest_Voyager subreddit in order to communicate directly with Voyager

---

[4]     Paul Barron Network, *Voyager CEO Steve Ehrlich interview – VGX Commission-Free + Earn Interest on Crypto*, YOUTUBE (May 3, 2021), https://www.youtube.com/watch?v=nKevUsTGN3I.

[5]     Steven Steele (@MrStevenSteele), TWITTER (July 20, 2022, 1:00 AM), https://twitter.com/mrstevensteele/status/1549665655275884545?s=11&t=aeo96ASWA8K8FMOgVdpqOA.

investors and potential investors.[6]  Ehrlich emphasized Voyager's transparency, stating: "Because we're a public company, Voyager gets audited on an annual basis and reviewed on a quarterly basis to prove we have the assets.  We believe only one other US company in crypto is as transparent as we are."  He also invited investors to "ditch your bank."[7]

46.    Ehrlich also falsely represented that he and Voyager were committed to "ensur[ing] the safety and security of all customer assets at all points in time," and that "we eat that risk on our end to ensure you get a consistent monthly return on your end."[8]

47.    Ehrlich obtained massive personal benefits as a result of the sale of the unregistered Earn Account securities.  Voyager filings show that Ehrlich made at least $30 million disposing of Voyager equity.  Most of Ehrlich's sales occurred in early 2021, when Voyager's equity shares reached their peak value of $29.86.

48.    In addition, Ehrlich received a $1.9 million bonus on or around February 28, 2022, just months before Voyager became unable to honor customer withdrawals.

49.    Voyager's COO Hanshe also publicly promoted Voyager and its Earn Accounts.

50.    For example, in January 2020, Hanshe tweeted: "Convert your skeptic friends and family to #crypto with $USDC.  They can earn 6% on a stable asset backed by $USD reserves. Banks pay 0.2%!!  When they see all the pretty green ticks and 20% moves in $BTC they won't be able to resist a dabble!! Refer them and both get $25 BTC!"[9]

---

[6]     r/Invest_Voyager, REDDIT (Mar. 11, 2022), https://www.reddit.com/r/Invest_Voyager/comments/tbyp2w/ama_hi_reddit_im_steve_ehrlich_voyagers_cofounder/?utm_source=share&utm_medium=ios_app&utm_name=iossmf.

[7]     *Id.*

[8]     *Id.*

[9]     Gerard (@cryptolymath), TWITTER (Jan. 31, 2020, 9:56 AM), https://twitter.com/cryptolymath/status/1223303991725084673.

51.     In May 2020, Hanshe tweeted: "If only there were a way to buy a set dollar amount of as many as 34 crypto assets on some set schedule, without commissions, where I could also earn interest while not being subject to lockups . . . Enter @investvoyager."[10]

52.     On October 27, 2021, Hanshe retweeted a tweet by the Dallas Mavericks stating that "[w]e are proud to announce the official cryptocurrency brokerage of the Dallas Mavericks, Voyager!"[11]

53.     On November 19, 2021, Hanshe tweeted a technical analysis of Bitcoin's price and stated: "All signs suggest the right move here is to stay cool & confident, setup recurring buys on @investvoyager, disable the sell button and GO OUTSIDE!!"[12]

54.     Hanshe also advertised Voyager's Earn Accounts as a safe way to beat inflation. On December 11, 2021, Hanshe tweeted: "$USD #CPI inflation rose 6.8% year-over-year, the fastest rate of change since NEXT month."  He then urged investors to "[p]ut your dollars into 'stuff.' #bitcoin and #crypto is stuff" and provided a link to Voyager's Twitter.[13]

55.     On February 15, 2022, Voyager tweeted out a link to its Q2 earnings report, stating: "Earnings are in and fiscal Q2 22 was our best quarter yet with $164.8M in revenue."  Hanshe retweeted this, adding: "Another great quarter for @investvoyager – I want to especially thank our

---

[10]     Gerard (@cryptolymath), TWITTER (May 13, 2020, 5:47 PM), https://twitter.com/cryptolymath/status/126 0733980254535683.

[11]     Dallas Mavericks (@dallasmavs), TWITTER (Oct. 27, 2021, 9:57 AM), https://twitter.com/dallasmavs/status /1453405584171012099.

[12]     Gerard (@cryptolymath), TWITTER (Nov. 19, 2021, 5:23 AM), https://twitter.com/cryptolymath/status/1461 686671947280390?cxt=HHwWjMC55ZSS-sgoAAAA.

[13]     Gerard (@cryptolymath), TWITTER (Dec. 11, 2021, 5:53 AM), https://twitter.com/cryptolymath/status/1469 666665487077377?cxt=HHwWgsC46fWCp-UoAAAA.

awesome and still quickly expanding team of dedicated employees who each contribute their all, every single day, to support and enhance the value our platform delivers to our users!"[14]

56.     In March 2022, Hanshe once again advertised Voyager's Earn Accounts as a safe way to beat inflation, tweeting: "Yet again, 'the highest YoY inflation since NEXT month" crimes to fruition.  Up 0.8%/mo, 7.9%/year.  Coincidence that if you used @investvoyager to earn yield all year on $USDC, a free-market based and not Fed-manipulated rate, you would be up 1% in purchasing power?  Hmmm . . . "[15]

57.     Like Voyager's CEO Ehrlich, Hanshe also obtained a significant personal benefit from the sale of unregistered Earn Account securities.   In the year preceding Voyager's bankruptcy, he received approximately $2.5 million in non-qualified stock options.

**C.     The Voyager Earn Accounts Are Unregistered Securities Under *Reves***

58.     Voyager has never been registered in any capacity with the SEC; nor have the Voyager Earn Accounts or VGX Tokens been registered with the SEC or any other state securities agency.

59.     Under Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), a "security" is defined to include any "note."

60.     The Supreme Court has noted that "Congress' purpose in enacting the securities laws was to regulate ***investments***, in whatever form they are made and by whatever name they are so called."  *Reves*, 494 U.S. at 61.  While not all notes are investments, pursuant to the family resemblance test articulated by the Supreme Court, a note is presumed to be a security and that

---

[14]     Gerard (@cryptolymath), TWITTER (Feb. 15, 2022, 6:46 AM), https://twitter.com/cryptolymath/status/1493 597688100753409?cxt=HHwWgsC4yeLLqbopAAAA.

[15]     Gerard (@cryptolymath), TWITTER (Mar. 10, 2022, 3:17 PM), https://twitter.com/cryptolymath/status/1502 061045963186180.

presumption may be rebutted only by a showing that the note bears a strong resemblance to one of

the enumerated categories, such as a "'note delivered in consumer financing'" or the "'note secured

by a mortgage on a home.'"  *Id.* at 65 (citation omitted).  The factors suggesting a note is a security

include: (1) investments in a business enterprise; (2) the "common trading" of the notes offered

and sold to a broad segment of the public; (3) the public's reasonable perception from

advertisements for the notes that they were investments; and (4) the lack of any risk-reducing

factor that would make the application of the Securities Act unnecessary, since the notes were

uncollateralized and uninsured and would escape federal regulation entirely if the Securities Act

were held not to apply.  *Id.* at 65-66.

61.     These factors underscore that the notes issued by Voyager and Defendants in the

form of Earn Accounts were securities.  First, Plaintiffs and the Class invested fiat and/or

cryptocurrencies in a business enterprise, namely Voyager.  There was common trading of the

funds deposited in these Earn Accounts in that the digital assets deposited by Earn Program

Investors were regularly offered and sold to both institutional and retail investors.

62.     Most significantly, all of the marketing materials promoted by Defendants led

Plaintiffs and the Class to believe that investing in an Earn Account with Voyager was an

investment.  For example, Ehrlich emphasized that he and Voyager are "***really trying to create***

***wealth for retail consumers***."  And Voyager's website invited Plaintiffs and the Class to "[g]row

your crypto portfolio" and "journey to the new frontier of investing."

63.     Finally, Voyager's failure and inability to make good on investors' deposits lays

bare that these notes were uncollateralized and uninsured.

**D.        The Voyager Earn Accounts Are Unregistered Securities Under *Howey***

64.        Section 2(a)(1) of the Securities Act also defines a "security" to include any "investment contract."  15 U.S.C. §77b(a)(1).  An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others."  *Howey*, 328 U.S. at 301.  Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  This definition embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"  *Howey*, 328 U.S. at 299.  Accordingly, in analyzing whether something is a security, "'form should be disregarded for substance,'" and the emphasis should be "on the economic realities underlying a transaction, and not on the name appended thereto."  *Forman*, 421 U.S. at 848-49 (citation omitted).

65.        Plaintiffs and the Class's investments in Earn Accounts meet this definition as they invested money or other valuable consideration, in a common enterprise, Voyager, with the expectation of profits based upon the efforts of Voyager and Defendants.

66.        Plaintiffs and the Class invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase Earn Accounts.

67.        Voyager and Defendants offered and sold the Earn Account investments to the general public through the Voyager Website and mobile app.

68.     Each and every purchase of Earn Accounts by a member of the public is an investment contract.   Stated otherwise, each time a member of the public placed fiat or cryptocurrency in an Earn Account, they were in actuality purchasing an investment contract.

69.     Additionally, Plaintiffs and the Class were passive investors in the Earn Accounts. Accordingly, the profits of each Plaintiff and the Class were intertwined with those of Voyager and Defendants.   Voyager's bankruptcy filings reveal that it used funds from Earn Program Investors to partially fund its operations.

70.     Voyager and Defendants pooled the assets of Earn Program Investors and controlled and utilized those assets in an effort to obtain a greater return than that paid to the Earn Program Investors.

71.     Investors in Voyager's Earn Accounts, including Plaintiffs and the Class, made their investments with a reasonable expectation of profits.   The Earn Accounts were sold to investors as a way to "[g]row your crypto portfolio."   In fact, the sole reason for placing one's assets in an Earn Account was to earn a return on the assets placed in the Earn Account through the above-market interest rates offered by Voyager and Defendants.

72.     Investors' profits in the Earn Accounts were to be derived from the managerial efforts of others, specifically Voyager and Defendants.   Earn Program Investors relied on the managerial and entrepreneurial efforts of the Defendants to manage, oversee, and/or develop the projects and investments funded by sale of the Earn Accounts.

73.     Defendants held themselves out to investors as experts in the investment and cryptocurrency fields.

74.     As CEO, Ehrlich ran Voyager's day-to-day operations and was responsible for all aspects of company products and strategy and for the growth of and investment in the company.

E.      **Defendants Knew that the Earn Accounts Were Unregistered Securities**

75.     A nearly identical financial product (*i.e.*, a high interest cryptocurrency lending account) offered by BlockFi was investigated by the SEC in 2022.  On February 25, 2022, the SEC announced a settlement with BlockFi for $100 million in penalties for offering unregistered BlockFi interest accounts ("BIAs") that offer high APRs to customers to lend out digital tokens. Pursuant to that settlement, the BIAs (which are virtually identical in form and substance to the Voyager Earn Accounts) must now be classified and registered as securities under applicable securities laws, as BlockFi was determined not to qualify for an exemption from SEC registration. BlockFi agreed to cease offering or selling BIAs in the United States until it registers its crypto-lending products.

76.     Shortly thereafter, the New Jersey Bureau of Securities issued a cease-and-desist order, finding that the Voyager Earn Accounts were securities and that Voyager offered and sold these unregistered securities in violation of New Jersey law.

77.     Despite being on clear notice that their Voyager Earn Accounts constituted unregistered securities, Voyager and Defendants continued to offer these unregistered securities to retail investors across the United States.

F.      **Voyager Bankruptcy**

78.     In mid-2022, the price of cryptocurrency assets declined across the board as did demand for new cryptocurrency investments.  This broader market downturn exposed the fragility of Voyager's investment products and revealed that Voyager did not have enough assets on hand to meet its withdrawal obligations.

79.     On May 24, 2022, the co-founder of Three Arrows Capital, tweeted that he was "[e]xcited to co-invest in Voyager."  Ehrlich retweeted this, adding: "Excited to have you on as an investor and partner!!!"[16]

80.     Following cryptocurrency lending platform Celsius Network's announcement that it was suspending investor withdrawals, many investors, including Plaintiffs, grew concerned about their Voyager Earn Account investments.  However, Voyager CEO Ehrlich sought to reassure customers, stating that: "'Our partnership with Celsius ended a while ago so our customers' assets are safe and we're processing everything as normal.'"[17]  Ehrlich further assured investors that Voyager was prepared for volatility in the markets, as the company's management team has extensive experience in the financial industry and has operated through the ups and downs of the markets for several years.

81.     On that same day, Ehrlich also retweeted a Voyager press release to purportedly provide "an asset and risk management update in light of changing market conditions."[18]  The release stated:

> ***Voyager differentiates itself through a straightforward, low-risk approach*** to lending and asset management by working with a select group of reputable counterparties, which are all vetted through extensive due diligence by its Risk Committee.  The company does not participate in DeFi lending activities, algorithmic stablecoin staking and lending, or derivative assets, such as stETH.  One of ***Voyager's important objectives is to make crypto as simple and safe as possible*** for consumer use.  With that mission in mind, safeguarding customer assets is a top priority.[19]

---

[16]     Stephen Ehrlich (@Ehrls15), TWITTER (May 24, 2022, 6:44 AM), https://twitter.com/Ehrls15/status/1529096087713218567.

[17]     Adam Eckert, *Exclusive: Voyager Digital CEO Says 'Customer Assets Are Safe' Amid Crypto Collapse*, BENZINGA (June 13, 2022), https://www.benzinga.com/markets/cryptocurrency/22/06/27682428/exclusive-voyager-digital-ceo-confirms-customers-assets-are-safe-amid-crypto-collapse.

[18]     *Voyager Digital Provides Update on Asset & Risk Management*, YAHOO FINANCE (June 14, 2022), https://finance.yahoo.com/news/voyager-digital-provides-asset-risk-114500760.html.

[19]     *Id.*

82.     Ehrlich himself added that the "'***company is well capitalized and in a good position to weather this market cycle and protect customer assets***.  It is Voyager's goal to continue to build secure products and services, as well as build trust and leadership in the cryptocurrency industry.'"

83.     However, just days later, on July 1, 2022, Ehrlich tweeted: "Voyagers, today we made the difficult decision to temporarily suspend trading, deposits, withdrawals, and loyalty rewards."  He added that: "We have taken steps to avoid this outcome—including securing a credit facility from Alameda and lowering daily withdrawal limits.  But the failure of a borrower, Three Arrows Capital, to repay a substantial loan to us makes this the right path forward."[20]

84.     On July 6, 2022, Voyager filed for Chapter 11 bankruptcy.  Voyager's inability to honor investor withdrawals and subsequent bankruptcy filing underscores investors' reliance on the efforts of Voyager and Defendants to provide the expected profits.  Ultimately, Plaintiffs and the Class bore the cost for Defendants' failures.

## G.     The Board Defendants

85.     Voyager's Co-Founder and Chairman, Philip Eytan, also frequently promoted Voyager's Earn Accounts and the VGX Token.

86.     In January 2021, Eytan boasted: "Out of the 55 coins we offer now, #VGX is up over 2800% in the past 12 months just behind #BAND (3400%) @investvoyager."[21]

---

[20]     Stephen Ehrlich (@Ehrls15), TWITTER (July 1, 2022, 11:51 AM), https://twitter.com/Ehrls15/status/1542943887899123718.

[21]     Philip (@PhilipEytan), TWITTER (Jan. 14, 2021, 1:04 AM), https://twitter.com/PhilipEytan/status/1349643629174923264.

87.     During that same month, Eytan retweeted an article regarding Voyager's CEO, stating: "When Voyager Digital has a CEO of this caliber you know your assets are in good hands @investvoyager."[22]

88.     In June 2021, Eytan took to Twitter, stating: "@investvoyager is the platform that can let you earn interest instead of that boring checking/savings account at your bank."[23]

89.     In August 2021, Eytan posted a chart showing increases in the price of VGX and exclaimed: "VGX best performing coin in the past month @investvoyager."[24]  Just days later, Eytan posted a link to an article with a VGX price prediction and asked rhetorically: "Interesting IMHO @investvoyager.  Token Price Prediction 2021 – Will VGX Price Hit $10 in 2021?"[25]

90.     In November 2021, Eytan took to Twitter to celebrate cryptocurrency exchange Coinbase listing the VGX Token, proclaiming: "$VGX is on $COIN!!!!!!"[26]

91.     Eytan also frequently advertised that Voyager was compliant with United States regulations, including those imposed by the SEC.  In January 2021, Eytan tweeted: "No choice here.  Voyager follows SEC guidelines."[27]

92.     Upon joining Voyager's Board, Jarrett Lilien proclaimed that with "Voyager, the customer is king."  Lilien stated the he would "help Voyager as it shapes this new market."  When

---

[22]     Philip (@PhilipEytan), TWITTER (Jan. 4, 2021, 11:22 PM), https://twitter.com/PhilipEytan/status/13463562 91992657920?s=20&t=8DC-K5gV5ryhiCuS2Dq9oQ.

[23]     Philip (@PhilipEytan), TWITTER (June 16, 2021, 4:18 AM), https://twitter.com/PhilipEytan/status/140 5122694383874049.

[24]     Philip (@PhilipEytan), TWITTER (Aug 4, 2021, 1:22 PM), https://twitter.com/PhilipEytan/status/ 1423016591680225286.

[25]     Philip (@PhilipEytan), TWITTER (Aug 11, 2021, 5:40 AM), https://twitter.com/PhilipEytan/status/1425 436895862038534.

[26]     Philip (@PhilipEytan), TWITTER (Nov. 17, 2021, 12:56 PM), https://twitter.com/PhilipEytan/status/146 1075837252427791.

[27]     Philip (@PhilipEytan), TWITTER (Jan. 7, 2021, 4:11 AM), https://twitter.com/PhilipEytan/status/1347153922 721525761?s=20&t=8DC-K5gV5ryhiCuS2Dq9oQ.

asked what needs to happen for mass crypto adoption, he stated "counter-intuitively, we may also need to see a bear market in equities and possibly a recession.  There needs to be an acceptance that this is not a flash in the pan or the product of a longtime bull market.  Living through an entire market cycle is what it took for the online space to really take off and be accepted.  I think the same may be true here."[28]

93.     Voyager rolled out its Earn Accounts and the Voyager Loyalty Program during the time each of the Board Defendants was a member of its Board.  As members of Voyager's Board, the Board Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Voyager's Earn Accounts and the VGX securities as described herein.

**H.     VGX Tokens**

94.     Voyager and Defendants have also sold VGX Tokens to the general public to finance their operations.

95.     According to Voyager's own website, "In the summer of 2021, the Voyager token underwent one of the largest token swaps and mergers in crypto history, creating VGX 2.0.  The new VGX gives Voyager the ability to reward users with industry-leading incentives and bonuses, to show our appreciation for using the Voyager platform.  VGX 2.0 has intrinsic utility on our platform and will continue to be an essential part of Voyager's future product offerings."[29]

96.     The VGX Token powered Voyager's new "Loyalty Program, which provides incentives, rewards, and more to VGX holders depending on the number of tokens they hold.  The Loyalty Program provides the ultimate way to hold and use the VGX token to take your earning

---

[28]     Tess McCurdy, *Cyrpto Talk with Jarrett Lilien, Voyager Digital Board Member*, VOYAGER (Apr. 16, 2019), https://www.investvoyager.com/blog/crypto-talk-with-jarrett-lilien-voyager-board-member/.

[29]     *VGX: The Ultimate Utility Token*, VOYAGER (Oct. 10, 2021), https://www.investvoyager.com/blog/vgx-the-ultimate-utility-token/.

potential to the next level.  Through this unprecedented rewards program built within the Voyager ecosystem, ***the Loyalty Program makes VGX the key to easily growing your crypto portfolio***."[30]

97.     Voyager claimed that "VGX acts as more than just a cryptocurrency—***it's the key to the Voyager platform, unlocking more ways to earn and more ways to grow***."[31]

98.     Voyager's Loyalty Program was "broken into three distinct reward tiers—adventurer, explorer, and navigator."  The more VGX held by an investor, the greater rewards they stood to gain while using the Voyager platform, including while investing in Voyager's Earn Account securities.  As Voyager, summarized it: "With each tier, you stack more VGX and level up your earnings."[32]

99.     Voyager advertised that "VGX enables consistent portfolio growth through the Voyager Loyalty Program," through VGX staking rewards, boosting rewards earnings, and earning crypto back on trades.[33]

100.    Voyager advertised that "VGX [T]okens held on Voyager automatically earn 7% annual staking rewards, which are paid out monthly in tandem with the Voyager Earn Program. Minimum balances apply."[34]

101.    It further advertised that "VGX gives you the power to grow multiple parts of your portfolio at once.  By holding VGX on Voyager, you'll automatically receive boosted rewards on your BTC, ETH, and USDC."[35]

---

[30]     *Id.*

[31]     *Id.*

[32]     *Id.*

[33]     *Id.*

[34]     *Id.*

[35]     *Id.*

102. Voyager also advertised VGX as a way for large VGX holders to collect "VGX back on trades. Voyager uses smart order routing technology to obtain constant price improvement, meaning that Voyager scours the market to fill your order and beats the quoted price in the app. Explorer and Navigator tiers receive 2x or 3x the price improvement normally given to customers, which is paid out in VGX at the end of each month."[36]

103. Voyager's website further asserted that: "In the true spirit of crypto decentralization, staking the Voyager token will give the community a role in governance in the coming years. The Voyager community will have the opportunity to vote on proposals submitted by Voyager on annual staking yields and more."[37] However, Voyager never gave VGX holders a role in governance as promised.

104. Voyager also highlighted the link between its ongoing success and the VGX Token, stating that, "as the Voyager Loyalty Program evolves and grows, VGX will grow with it, creating new ways to reward the Voyager community. Keep an eye out for more updates on the Loyalty Program and the future of VGX."[38]

105. The Voyager Website provided detailed instructions on how investors could purchase VGX Tokens on the Voyager platform.

106. Defendants also relied on VGX Tokens to fund Voyager's operations. Given this reliance, it is unsurprising that Defendants and Voyager aggressively marketed VGX to prospective purchasers, including Plaintiffs and the Class, to drive demand, increase VGX's price, and thus their own profits.

---

[36]     *Id.*

[37]     *Id.*

[38]     *Id.*

107.    For example, in December 2020, Voyager's COO Hanshe took to Twitter to state that: "I work VERY hard 365/7 to deliver value for Voyager's customers, shareholders and token holders.  I believe in our continued growth and success, which will drive value for all involved, and echo Philip [Eytan]'s confidence.  As an insider, I don't tweet to promote VGX or our stock."[39]

108.    In January 2021, Hanshe posted a chart showing VGX's price appreciation and stated: "@CoinMarketCap coin list sorted by 7d return %. @investvoyager platform token $VGX lapping the field.  Big feature news coming and being built on top of our explosive growth."[40]

109.    About a month later, Hanshe once again highlighted the ties between Voyager and VGX Token, posting a picture of a tattoo with Voyager's logo and saying: "So if you want to know how committed I am to the Voyager/$VGX mission and it's success, not sure a better way to say it than this . . . Still healing, and full tattoo reveal to come (once healed, but let's just say . . . 'Not going to go work at a competitor anytime soon!!'"[41]

110.    On or about October 11, 2021, a Twitter user responded to a post Hanshe made regarding the price of Bitcoin, saying: "[w]hat would really make more #Voyagers excited is a $VGX face melting type of run."  Hanshe responded by saying: "I am very bullish on our business, our growth, our ability to deliver products/features, and the VGX utility/marketing strategy being deployed.  Then will let the market decide how many dollars one token is worth, as it will do that whether I like it or not."[42]

---

[39]    Gerard (cryptolymath), TWITTER (Dec. 23, 2020, 9:20 AM), https://twitter.com/cryptolymath/status/1341795790491181057.

[40]    Gerard (cryptolymath), TWITTER (Jan. 14, 2021, 7:00 AM), https://twitter.com/cryptolymath/status/1349733171722522625.

[41]    Gerard (cryptolymath), TWITTER (Feb. 19, 2021, 3:27 PM), https://twitter.com/cryptolymath/status/1362906600441282560.

[42]    Gerard (cryptolymath), TWITTER (Oct. 11, 2021, 9:36 AM), https://twitter.com/cryptolymath/status/1447601967824572418.

111.    On December 11, 2021, Voyager's CEO Ehrlich took to Twitter, stating: "So let's see inflation is 6.8% and #VGX rewards on USDC is up to 10.5% and VGX staking is 7%. Hmmmmm."[43]

112.    On that same day, Hanshe responded to a Twitter post which highlighted that newly minted VGX Tokens also "have an inflationary problem."  Hanshe responded: "But you also earn 7% rewards for holding, no? Your bank/gov't is rewarding you 6.8% for holding $USD? If so, please advise.  Wait, one USD equivalent I know of keeping pace or beating inflation is $USDC on @investvoyager."  Hanshe then highlighted the link between Voyager's Earn Accounts and the VGX Token by stating that this was true, "[e]specially if you are in the #VLP," a reference to the Voyager Loyalty Program.[44]

113.    In February 2022, Reese Witherspoon posted to Twitter, stating that she "would love to hear about the most sustainable crypto currencies."  Ehrlich responded, saying: "One place to buy and sell #VGX @investvoyager."[45]

114.    Despite Defendants' promotion of the VGX Token, the token's price has declined by more than 90% over the last year, from approximately $5.18 in November 2021 to $0.40 today.

## I.    VGX Is a Security

115.    The SEC Framework provides guidance for analyzing whether a digital asset has the characteristics of one particular type of security—an "investment contract."

---

[43]    Stephen Ehrlich (@Ehrls15), TWITTER (Dec. 11, 2021, 11:05 AM), https://twitter.com/Ehrls15/status/14697 45270887964689.

[44]    Gerard (cryptolymath), TWITTER (Dec. 11, 2021, 6:14 AM), https://twitter.com/cryptolymath/status/146967 2018593431563.

[45]    Stephen Ehrlich (@Ehrls15), TWITTER (Feb. 4, 2022, 5:40 PM), https://twitter.com/Ehrls15/status/148977 5946102099970.

116.    As explained in the SEC Framework:

The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.[46]

117.    The SEC Framework makes clear that "[w]hether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances."[47] The specific facts and circumstances relating to VGX support the conclusion that VGX is a security under the *Howey* test.

118.    Purchasers who bought VGX have invested money or given valuable services to a common enterprise, Defendants and Voyager. These purchasers have had a reasonable expectation of profit based upon the efforts of the promoter, Voyager, including, amongst other things: (i) Voyager and Defendants' representations that VGX Tokens would help investors grow their portfolio; (ii) that Voyager's website maintains metrics on the performance of VGX and detailed instructions on how to purchase VGX; (iii) Voyager and Defendants' leadership in the development of the Voyager platform and Earn Accounts; (iv) the implementation of a Loyalty Program based on VGX ownership; and (v) the promise to conduct a token burn to reduce the circulating supply of VGX, all of which contributes to the value of VGX.

---

[46]     SEC Framework §I (footnotes omitted).

[47]     *Id.*, §II.

     **1.**      **VGX Purchasers Made an Investment of Money in a Common Enterprise**

119.    The SEC Framework states that: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[48]

120.    Plaintiffs and the Class invested fiat and other digital currencies, such as Bitcoin and Ethereum, to purchase VGX.  As explained in the SEC Framework, investment of both fiat and digital currency meets the first prong of *Howey*.

121.    The profits of each investor in VGX are inextricably intertwined with those of all other purchasers because VGX is fungible.

122.    The SEC Framework states that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."[49]  The SEC Framework also elaborates: "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[50]

123.    VGX is no exception to the SEC Framework's observation regarding the "common enterprise" element of the *Howey* test.  The prospective profits of Plaintiffs and the Class, if any, are intertwined with the fortunes of Voyager.  Voyager concedes that it also used the funds from its VGX Tokens to partially fund its operations.

---

[48]    *Id.*, §II(A) (footnote omitted).

[49]    *Id.*, §II(B) (footnote omitted).

[50]    *Id.* at n.11 (citing *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992)).

## 2.     VGX Investors Had a Reasonable Expectation of Profits

124.    With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[51]

125.    Investors in VGX, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits.

126.    Defendants themselves have recognized that VGX investors have a reasonable expectation of profit, and publicly touted VGX's price performance on numerous occasions.

127.    Defendants have also taken concrete steps to increase the value of the VGX Token. For example, Voyager initially advertised that: "In an effort to help reduce the circulating supply of tokens, Voyager will introduce a 25% token burn of all VGX used to pay for withdrawal fees on the Voyager app from Voyager Loyalty program members."[52]  In January 2022, a Twitter user asked Ehrlich: "Is the token burn still an option for VLP 2.0 of is it off the table due to causing $VGX to be labeled as a security?"[53]

128.    Ehrlich responded by asserting that "VGX is not a security . . . Burn is still part of VLP 2.0."[54]  However, Plaintiffs are informed and believe that Voyager did not ultimately implement the advertised token burn.

---

51      *Id.*, §II(C).

52      *Voyager Loyalty Program & Token Utility Model*, VOYAGER (May 1, 2021), https://www.investvoyager.com/blog/voyager-loyalty-program-token-utility/#:~:text=In%20an%20effort%20to%20help,from%20Voyager%20Loyalty%20program%20members.

53      Stephen Ehrlich (@Ehrls15), TWITTER (Jan. 23, 2022, 11:19 AM), https://twitter.com/Ehrls15/status/1485331310176518148.

54      *Id.*

129.   The SEC Framework lays out a number of characteristics informative of whether the "reasonable expectation of profits" element is met.  The SEC Framework states that "[t]he more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit . . . ."[55]  Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of VGX:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

- The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

*      *      *

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that [the Defendants'] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and

---

[55]   SEC Framework, §II(C)(2).

the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The [Defendants have] raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The [Defendants are] able to benefit from [their] efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The [Defendants] continue[] to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of [Defendants] or [their] ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that [the Defendants] will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  o The availability of a market for the trading of the digital asset, particularly where the [Defendants] implicitly or explicitly promise[] to create or otherwise support a trading market for the digital asset.[56]

---

[56]    *Id.*

### 3.     The Success of VGX Requires Efforts of Voyager and Others

130.    The SEC Framework explains:

> When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met.   Relevant to this inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."   The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.[57]

131.    Specifically, with respect to the element of "[r]eliance on the [e]fforts of [o]thers," the SEC Framework states:

> The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:
>
> ▪     Does the purchaser reasonably expect to rely on the efforts of a[] [promoter]?
>
> ▪     Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?[58]

132.    Plaintiffs and the Class have entirely passive roles vis-à-vis the success of VGX. Rather, as Defendants' own marketing makes clear, the success of VGX, and the profits the Class reasonably expected to derive from investing in VGX, are dependent on the essential technical, entrepreneurial, and managerial efforts of Defendants, Voyager, and its agents and employees.

133.    Plaintiffs and the Class reasonably expected Defendants to provide significant managerial efforts, to develop and improve the Voyager platform and the Voyager Loyalty

---

[57]     *Id.*, §II(C) (footnotes omitted).

[58]     *Id.*, §II(C)(1) (footnotes omitted).

Program, and to provide and/or secure exchanges through which VGX can be traded or liquidated. Defendants repeatedly represented that they would provide significant managerial efforts to achieve these objectives and make VGX a profitable investment by:

        a.      Developing and attracting users to the Voyager platform;

        b.      Developing the Voyager Loyalty Program to provide financial incentivizes to VGX holders, and in particular to VGX holders that were also investors in Voyager's Earn Account securities; and

        c.      Burning VGX Tokens to reduce the circulating supply and thereby increase the value of VGX Tokens.

134.    VGX therefore derives its value entirely from the usefulness and popularity of the Voyager platform and the Voyager Loyalty Program, which is in turn highly, if not entirely, dependent on the significant technical, entrepreneurial, and managerial efforts of Voyager and Defendants. The purchase of VGX is thus an investment in a common enterprise, with an expectation of profits, based upon the efforts of its promoter, the Defendants.

135.    The SEC Framework lays out a number of characteristics informative of whether the "[r]eliance on the [e]fforts of [o]thers" element is met. The SEC Framework notes that "[a]lthough no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others . . . .'"[59] Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of VGX:

-     [Defendants are] responsible for the development, improvement (or enhancement), operation, or promotion of the network [and] purchasers of the digital asset expect [Defendants] to be performing or overseeing tasks

---

[59]    *Id.*, §II(C)(1).

that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

- Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale [both true of VGX and the Voyager Loyalty Program] purchasers would reasonably expect [Defendants] to further develop the functionality of the network or digital asset (directly or indirectly).  This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by [Defendants], rather than an unaffiliated, dispersed community of network users (commonly known as "decentralized" network).

- [Defendants] create[] or support[] a market for, or the price of, the digital asset.  This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- [Defendants] ha[ve] a lead or central role in the direction of the ongoing development of the network or the digital asset.  In particular, [Defendants] play[] a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- [Defendants] ha[ve] a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade.  For example, purchasers may reasonably rely on [Defendants] for liquidity, such as where the [Defendants have] arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

34

      o      Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

      o      Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect [Defendants] to undertake efforts to promote [their] own interests and enhance the value of the network or digital asset, such as where:

      o      [Defendants] ha[ve] the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the [Defendants] retain[] a stake or interest in the digital asset. In these instances, purchasers would reasonably expect [Defendants] to undertake efforts to promote [their] own interests and enhance the value of the network or digital asset.

      o      [Defendants] distribute[] the digital asset as compensation to management or [Defendants'] compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

      o      [Defendants] own[] or control[] ownership of intellectual property rights of the network or digital asset, directly or indirectly.

      o      [Defendants] monetize[] the value of the digital asset, especially where the digital asset has limited functionality.

136.    Here, the VGX Token and the Voyager Loyalty Program with which it is intertwined exhibit all of these characteristics.

## CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes of persons:

All persons or entities who purchased Voyager Earn Account securities and were subsequently damaged thereby. Excluded from the Class are: corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

All persons or entities who purchased VGX Tokens. Excluded from the Class are: corporate officers, members of the boards of directors, and senior executives of

Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

138.    The Class Period is defined as January 1, 2020, through the date of this filing, inclusive.[60]

139.    The members of the Classes are so numerous that joinder of all members is impracticable.  There are approximately 1,530,000 Voyager Earn Accounts.  While the exact number of Class members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, based on the number of Earn Accounts, Plaintiffs believe that there are at least 100,000 members of the proposed Classes.

140.    The Classes are readily ascertainable and identifiable.  They can be identified by reference to Defendants' own records and databases.

141.    Plaintiffs will fairly and adequately protect the interests of the Classes because Plaintiffs' claims are typical and representative of the claims of all members of the Classes. Plaintiffs suffered injury in fact as a result of their investments in Voyager Earn Accounts.

142.    Plaintiffs' claims are typical of the claims of all Class members, as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of state and federal securities laws.  All members of the Classes have sustained injury in fact as a result of Voyager's inability to pay the amounts due to them on their Earn Account investments.

143.    There are no unique defenses that may be asserted against Plaintiffs individually, as distinguished from the other members of the Classes, and the relief sought is common to the Classes.  Plaintiffs are typical of other members of the Classes, do not have any interest that is in

---

[60]      Plaintiffs reserve the right to expand or amend the Classes Definition or Period based on discovery produced in this matter.

conflict with or is antagonistic to the interests of the members of the Classes, and have no conflict with any other members of the Classes.

144.    Plaintiffs have retained competent counsel experienced in securities, cryptocurrency, and class action litigation to represent themselves and the Classes.

145.    Questions of law and fact common to the Classes that predominate over any questions that may affect only individual members of the Classes, include, but are not limited to:

a.      Whether Voyager Earn Accounts are securities under the Securities Act;

b.      Whether Defendants' offerings and sales of Earn Accounts violated the registration provisions of the Securities Act;

c.      Whether VGX is a security under the Securities Act;

d.      Whether Defendants' offerings and sales of VGX violated the registration provisions of the Securities Act;

e.      Whether Voyager Earn Accounts are securities under the New Jersey Uniform Securities Law;

f.      Whether Defendants' offerings and sales of Earn Accounts violated the registration provisions of the New Jersey Uniform Securities Law;

g.      Whether VGX is a security under the New Jersey Uniform Securities Law;

h.      Whether Defendants' offerings and sales of VGX violated the registration provisions of the New Jersey Uniform Securities Law;

i.      Whether Voyager Earn Accounts are securities under the California Corporations Code;

j.      Whether Defendants' offerings and sales of Earn Accounts violated the registration provisions of the California Corporations Code;

k.      Whether VGX are securities under the California Corporations Code;

l.      Whether Defendants' offerings and sales of VGX violated the registration provisions of the California Corporations Code; and

m.      The type and measure of damages suffered by Plaintiffs and the Classes.

146.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them.  In the absence of a class action, Defendants will retain the benefits of their wrongful conduct.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act
(Against All Defendants)**

147.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

148.    Defendants, and each of them, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

149.    Voyager Earn Accounts are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

150.    Plaintiffs and members of the Classes purchased Voyager Earn Account securities from Defendants.

151.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

152.    By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

153.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the Classes have suffered damages in connection with their respective purchases of Voyager Earn Account securities.

## SECOND CLAIM FOR RELIEF

### Violation of Section 15 of the Securities Act
### (Against All Defendants)

154.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

155.    This Count is asserted against Defendants under Section 15 of the Securities Act, 15 U.S.C. §77o.

156.    Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act.  Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Voyager Earn Accounts and VGX securities as described herein.

157.    Defendants, separately or together, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Voyager, through ownership of voting securities, by contract, subscription agreement, or otherwise.

158.    Defendants, separately or together, had sufficient influence to have caused Voyager to submit a registration statement.

159.    Defendants, separately or together, jointly participated in, and/or aided and abetted, Voyager's failure to register Earn Accounts and VGX Tokens.

160.    Defendants knew of or had reasonable grounds to believe in the existence of the facts underlying Defendants and Voyager's liability for violating Section 12(a) of the Securities Act, 15 U.S.C. §77l(a).

161.    By virtue of the conduct alleged herein, the Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Classes for rescission and/or damages suffered.

### <u>THIRD CLAIM FOR RELIEF</u>

**Unregistered Offer and Sale of Securities in Violation of California
Corporations Code Section 25110 and 25503
(Against All Defendants)**

162.    Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

163.    Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendants.

164.    The Voyager Earn Accounts and VGX Tokens are securities within the meaning of the California Corporations Code.

165.    The Voyager Financial Products were and are required to be registered with the Commissioner of Corporations under California law.

166.    The Voyager Financial Products have not been registered with the Commissioner, are not exempt from registration, and are not federally covered.  No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

167.    Defendants, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

168.    Plaintiffs purchased Voyager Financial Products securities from Defendants.

169.    By reason of the foregoing, each of the Defendants have violated Sections 25110 and 25503 of the California Corporations Code.

## FOURTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities in Violation of California
Corporations Code Section 25110 and 25504
(Against All Defendants)**

170.    Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

171.    Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendants.

172.    Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 25504 of the California Corporations Code.  Defendants, and each of them, had the power and influence and exercised the same to cause

the unlawful offer and sale of Voyager Earn Accounts and VGX Token securities as described herein in violation of Section 25110 of the California Corporations Code.

173.    Defendants, separately or together, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Voyager, through ownership of voting securities, by contract, subscription agreement, or otherwise.

174.    Defendants, separately or together, have sufficient influence to have caused Voyager to submit a registration or qualification statement.

175.    Defendants, separately or together, jointly participated in, and/or aided and abetted, Voyager's failure to register Voyager Earn Accounts and VGX Tokens in violation of Section 25110.

176.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Subclass for rescission and/or damages suffered.

## FIFTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities in Violation of**
**The New Jersey Uniform Securities Law, N.J.S.A. Section 49:3-60**
**(Against All Defendants on behalf of The National Classes and the New Jersey Subclass)**

177.    Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

178.    Plaintiffs bring this claim individually and on behalf of the members of the Classes and the New Jersey Subclass against Defendants.

179.    The Voyager Financial Products are securities as defined in N.J.S.A. Section 49:3-49(m) (defining "security" to include a "note" and an "investment contract").

180.    The Voyager Financial Products were and are required to be registered with the New Jersey Bureau of Securities ("Bureau") pursuant to N.J.S.A. Section 49:3-60.

181.    The Voyager Financial Products have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

182.    Defendants have offered and sold unregistered securities in violation of N.J.S.A. Section 49:3-60.

183.    By selling unregistered Voyager Financial Products to Plaintiffs, Class members, and Subclass members, Defendants violated the New Jersey Uniform Securities Law, and are liable to Plaintiffs, the members of the Classes, and the members of the New Jersey Subclass.

184.    As a direct and proximate result of Defendants' unregistered sale of Voyager Financial Products, Plaintiffs and members of the Classes and Subclass have suffered damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.  N.J.S.A. §49:3-71.

### SIXTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities in Violation of**
**The New Jersey Uniform Securities Law, N.J.S.A. Section 49:3-71-D**
**(Against All Defendants on behalf of The National Classes and the New Jersey Subclass)**

185.    Plaintiffs on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

186.    Plaintiffs bring this claim individually and on behalf of the members of the Classes and the New Jersey Subclass against Defendants.

187.    Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 49:3-71 of the New Jersey Uniform

Securities Law.  Defendants, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of Voyager Earn Accounts and VGX Token securities as described herein in violation of Section 49:3-60 of the New Jersey Uniform Securities Law.

188.    Defendants, separately or together, possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of Voyager, through ownership of voting securities, by contract, subscription agreement, or otherwise.

189.    Defendants, separately or together, have sufficient influence to have caused Voyager to submit a registration or qualification statement.

190.    Defendants, separately or together, jointly participated in, and/or aided and abetted, Voyager's failure to register Voyager Earn Accounts and VGX Tokens in violation of Section 49:3-60.

191.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Classes for rescission and/or damages suffered.

## SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment/Restitution
### (New Jersey Common Law, in the Alternative)
### (Against All Defendants)

192.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

193.    Plaintiff and members of the Classes conferred a monetary benefit on Defendants by raising the price and trading volume of the Voyager Financial Products, which allowed Defendants to sell their Voyager Financial Products to Plaintiff and Class members at inappropriately and artificially inflated prices.

194.    Defendants received a financial benefit from the sale of their Voyager Financial Products at inflated prices and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belong to Plaintiff and members of the Classes.

195.    Plaintiff seeks restitution in the form of the monetary value of the difference between the purchase price of the Voyager Financial Products and the price those Voyager Financial Products sold for.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on their behalf and that of the Classes as follows:

A.      Declaring that this action may be maintained as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Classes, and designating their counsel Scott+Scott Attorneys at Law LLP and Taylor-Copeland Law as Lead Counsel for the Classes;

B.      Declaring that Voyager Earn Accounts are securities and that Defendants' unregistered sales of Voyager Earn Accounts violated applicable laws;

C.      Declaring that VGX Tokens are securities and that Defendants' unregistered sales of VGX Tokens violated applicable laws;

D.      Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

E.      Awarding such injunctive or other equitable relief as the Court may deem just and proper; and

F.      Awarding Plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Dated:  November 9, 2022

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Sean T. Masson*

Sean T. Masson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
smasson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
John T. Jasnoch (*pro hac vice* forthcoming)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

**TAYLOR-COPELAND LAW**
James Q. Taylor-Copeland (*pro hac vice* forthcoming)
501 W. Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 400-4944
Facsimile: (619) 566-4341

*Attorneys for Plaintiffs*